**ENGINEERING CORPORATION OF AMERICA, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 12964.

United States Court of Appeals Seventh Circuit.

Nov. 22, 1960.

———◆———

Lucien L. Dunbar, Thomas C. Collier, Indianapolis, Ind., Merlin M. Dunbar, Indianapolis, Ind., Dunbar & Dunbar, Indianapolis, Ind., of counsel, for appellant.

Charles K. Rice, Asst. Atty. Gen., Tax Division, Frederick B. Ugast, Attorney, U. S. Department of Justice, Washington, D. C., Don A. Tabbert, U. S. Atty., Indianapolis, Ind., Lee A. Jackson, Harry Baum, Louise Foster, Attorneys, Department of Justice, Washington, D. C., for appellee.

Before HASTINGS, Chief Judge, KNOCH, Circuit Judge, and LA BUY, District Judge.

KNOCH, Circuit Judge.

Plaintiff brought this action to recover federal surtax on accumulated earnings, allegedly assessed in error under the Internal Revenue Code of 1939, Section 102, 26 U.S.C.A. § 102, in the following amounts:

| Taxable Calendar Year | Amount |
| --- | --- |
| 1950 | $6,051.12 |
| 1951 | 5,569.78 |
| 1952 | 7,794.71 |
| 1953 | 6,702.18 |

After trial, without jury, the District Court entered judgment for Defendant, from which Plaintiff has taken this appeal.

The District Court found that Plaintiff corporation was organized December 30, 1948, under the laws of Indiana; that it

primarily designed and manufactured items for Tube Processing, Inc., a corporation controlled by the same family interests; and that for all practical purposes, both Tube Processing and Plaintiff were controlled by one man, Edward H. Seybert. The District Court also found that Plaintiff had failed to pay reasonable dividends to its shareholders with the intention of avoiding surtaxes to them, and that such accumulation was not required for the purpose of the business under the circumstances.

Plaintiff states the contested issues to be:

"1. Whether the Findings of Fact and Conclusions of Law of the District Court are sustained by the evidence in the record.

"2. Whether under the evidence before the District Court, it erred in finding as a fact and conclusion of law that Plaintiff had not carried its burden of proving that it had not accumulated unreasonable amounts of earnings during each of the years 1950 to 1953, inclusive, for the purpose of preventing the imposition of surtax upon its shareholders within the meaning of the provisions of Section 102(a) of the Internal Revenue Code of 1939."

■■ Whether there has been an unreasonable accumulation of profits within the purview of Section 102, and whether Plaintiff corporation was availed of for the purpose of avoiding surtaxes to its stockholders, present questions of fact. Helvering v. Chicago Stock Yards Co., 1943, 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086; Olin Corp. v. C. I. R., 7 Cir., 1942, 128 F.2d 185, 187. This Court will not disturb the District Court's findings unless they are arbitrary or unsupported by substantial evidence. Pelton Steel Casting Co. v. C. I. R., 7 Cir., 1958, 251 F.2d 278, 281, certiorari denied 356 U.S. 958, 78 S.Ct. 995, 2 L.Ed.2d 1066.

Plaintiff contends that it has shown that its accumulations of earnings were justified by reasonable business needs in the light of the facts known to Plaintiff during the taxable years.

During the taxable years, Plaintiff's outstanding capital stock was owned as follows:

| Record Owner | Shares of Common | Shares of Preferred |
|---|---|---|
| Frederick G. Emrick | 50 | 0 |
| George J. Seybert | 24½ | 0 |
| Margaret J. Seybert | 24½ | 0 |
| Edward H. Seybert | 1 | 30 |

Edward H. Seybert, brother-in-law to Frederick G. Emrick, was guardian for his minor son and daughter who owned 24½ shares each of the common stock.

Plaintiff was engaged in highly specialized precision manufacture of tools, jigs, and fixtures, to be used as special bending equipment in fabricating aircraft tubing parts. Plaintiff also rendered professional engineering service in connection therewith. Almost all of Plaintiff's sales were made to Tube Processing, which manufactured formed tubing for sale to precision jet engine manufacturers.

On December 31, 1950, the common stock of Tube Processing was held as follows:

| | Shares |
|---|---|
| Edward H. Seybert, as Guardian for George J. Seybert | 1,990 |
| Edward H. Seybert, as Guardian for Margaret J. Seybert | 1,990 |
| Edward H. Seybert | 20 |

The 250 shares of preferred stock of Tube Processing were all held by plaintiff. Each share of common stock was entitled to one vote. Each share of preferred stock was entitled to 20 votes. The preferred stock had previously been owned by Mr. and Mrs. Edward H. Seybert, from whom Plaintiff acquired it about December 11, 1950, for $65,000. About February 23, 1952, Plaintiff sold 52 shares of this preferred stock to Tube Processing, at $260 per share. This reduced Plaintiff's vote in Tube Processing from a majority of 5,000 out of 9,000 votes to a minority of 3,960 out of 7,960 votes.

There was substantial evidence to support a finding that Edward H. Seybert, by his personal holdings, his interest in Plaintiff, and his guardianship interest in his children's shares, was for practical purposes, in control of both corporations.

Plaintiff contends that, on the contrary, Plaintiff was controlled by Frederick G. Emrick, who in the testimony and in the briefs is frequently referred to as the President of Plaintiff. However, minutes of meetings of Plaintiff's Board of Directors, show that Edward H. Seybert was President of Plaintiff in 1949, 1950, 1951, 1952, 1953, 1954 and 1955.

Plaintiff and Tube Processing occupied the same premises together. These premises were owned and leased to Plaintiff and Tube Processing, by the two minors George and Margaret Seybert for whom Edward H. Seybert acted as Guardian. Mr. Emrick testified that this close proximity was required by the nature of the service rendered by Plaintiff; that particular tools had to be designed and made for particular machines; that 99½% of Plaintiff's sales were to Tube Processing. He explained that both Plaintiff and Tube Processing were in need of additional space and Plaintiff's officers feared that Tube Processing's expansion would require the space then used by Plaintiff. Plaintiff was therefore accumulating funds to provide itself, if needed, with a new building. Plaintiff was also in need of additional machinery and equipment and was accumulating funds for that purpose as well. He testified further that Plaintiff was concerned about renegotiation of its government contracts and feared that large sums would have to be refunded. He also testified that obsolescence of its product was a present danger and that changing requirements of the aircraft industry might entail complete retooling at a cost of $150,000 and a period of perhaps six months without income while a new product was developed. Plaintiff contends that all these possible needs dictated large accumulations of cash.

Plaintiff's books and records do show retention of about 99% of its earnings for the years in question. The District Court considered the cash balances shown by Plaintiff's books to be misleading in that large accounts receivable of Tube Processing were carried at the close of each year, although Tube Processing, itself in a very sound financial position, has always been prompt in its payment of obligations to Plaintiff.

In fact, Plaintiff expanded its plant and equipment only slightly during the years in question. Mr. Emrick testified that much of the machinery needed was not then available on the market and had to be acquired in later years. Events proved that Plaintiff was able to accomplish such expansion as was necessary without recourse to these accumulated current earnings.

With respect to renegotiation of its profits, Plaintiff had been informed on February 1, 1954, that renegotiation of its profits for 1952 had been commenced. About March 11, 1955, Plaintiff received notice that renegotiation of profits for 1953 had begun. On September 21, 1956, Plaintiff was notified that no adjustment of 1951 profits would be made. It was not until January 22, 1958, that Plaintiff was notified that it would be compelled to refund $20,000 for 1952. The net amount was only $2,610 because resultant reduction in Plaintiff's profits resulted in an income tax and excess profits tax credit of $17,390. In setting up its

figures for possible refund of profits, Plaintiff made no allowances on its books for the resulting tax credits. But, in any case, it does not appear that the possible need for refund on renegotiation weighed heavily in Plaintiff's retention of profits because on October 22, 1955, while renegotiation needs were still unsettled, Plaintiff, for the first time, declared dividends on its common stock, and then, in the rather substantial sum of $50,000. Plaintiff explains this action as justified because many of its other contingent needs had been reduced. It was about to move into new quarters, in 1956, and it had acquired about $50,000 in new machinery and equipment.

Mr. Emrick testified that one of Plaintiff's concerns had been the danger of losing its one large customer, Tube Processing. However, the common control of the two corporations and the close co-operation between them, as revealed in the minutes, would suggest no basis for this concern.

There is no evidence of anything more than nebulous plans for Plaintiff's expansion. As indicated, Plaintiff's work was carried on in a portion of the same building occupied by Tube Processing. There was testimony to the effect that such close proximity was essential. Plaintiff's lease covered the years in question. In fact, Tube Processing did erect an addition to the building in 1952, and did lease part of the added space to Plaintiff.

The financial statements show that Plaintiff's accounts payable and accrued expenses were not large. In retrospect the accumulations of earnings seem clearly unreasonable. However, Plaintiff argues that it was running a new and inexperienced business, and that this Section 102 tax is improperly imposed on its accumulations beginning with the second year of operation, at a time when its officers could not be expected to estimate its future needs with any accuracy.

The District Court found that the business was not a new one; that it grew out of a prior organization. The government contends that Plaintiff had ample experience on which to base its estimate of needs. Plaintiff attacks this finding of the District Court as unsupported by any evidence.

Mr. Emrick testified that Edward H. Seybert began processing tubes for aircraft engines about 1939, that he became a member of Lone Manufacturing Company, a partnership, which also processed aircraft engine tubes, and for whom Mr. Emrick worked as a supervisory engineer. Subsequently, Tube Processing, Inc., was incorporated in 1946 to do the same type of work. Lone Manufacturing discontinued processing tubes after the incorporation of Tube Processing, Inc. and was disbanded in 1950.

The evidence thus indicates that Tube Processing grew out of the earlier partnership. Plaintiff in its briefs asserts that jigs, dies, and tools were procured for both the partnership and for Tube Processing from outside sources. Plaintiff asserts that Plaintiff itself was formed in 1948 only because the general tool and die industry could not provide jigs and tools to meet Tube Processing's close tolerance specifications.

We have searched the record, exhibits and transcript of testimony, but find no support for this assertion. On the other hand, neither do we find any support for a finding that Lone Manufacturing ever made its own jigs, dies or tools. We must, therefore, conclude that the District Court's finding that both Plaintiff and Tube Processing evolved from Lone Manufacturing is not supported by the evidence.

The argument based on lack of experience might have some force with reference to the earlier years here involved. The evidence shows no significant change in the practices of the Plaintiff during the later years as it did acquire the experience on which it might base more accurate estimates of its needs. No dividends were declared on the common stock until after Plaintiff became aware that it was subject to this tax.

We have studied the evidence with respect to the contingent needs of which

Plaintiff speaks. Some examples have been noted above. Section 102(c) provides:

> "*Evidence determinative of purpose.*—The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary."

It is apparent that Plaintiff did not sustain the burden of proving by a clear preponderance of the evidence that earnings were not permitted to accumulate beyond the reasonable needs of the business. With the sole exception heretofore noted, we find that there is substantial evidence to support the findings of the District Court. In these circumstances, we may not substitute our judgment for these findings of the Trial Court.

Although not individually the subject of comment in this opinion, all arguments raised by Plaintiff have been carefully considered in arriving at our decision that the judgment of the District Court should be affirmed.